UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

MARLENE AVERHART JONES,

                                        Plaintiff,

            -vs-

                                                    04-CV-0493C

JO ANNE B. BARNHART,
Commissioner of Social Security,

                                        Defendant.

---

        Plaintiff Marlene Averhart Jones initiated this action pursuant to section 405(g) of

the Social Security Act, 42 U.S.C. § 405(g), to review the final determination of the

Commissioner of Social Security (the "Commissioner") denying plaintiff's application for

Supplemental Security Income ("SSI") benefits.[1]  The Commissioner has filed a motion for

judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure

(Item 13), and plaintiff has filed a cross-motion for judgment on the pleadings (Item 14).

For the following reasons, the Commissioner's motion is denied, and plaintiff's cross-

motion is granted.


## BACKGROUND

        Plaintiff was born on January 7, 1965 (Tr. 97).[2]  She applied for SSI benefits on

November 19, 1998, alleging disability as of April 15, 1993 due to a schizoaffective

---

[1]This case was transferred to the undersigned by order of the Hon. Richard J. Arcara dated
December 21, 2006 (Item 20).

[2]References preceded by "Tr." are to page numbers of the transcript of the administrative record,
filed by defendant as part of the answer to the complaint.

disorder[3] and post traumatic stress disorder ("PTSD") (Tr. 19-26).  Plaintiff's application

was denied initially and on reconsideration (Tr. 18).  Plaintiff requested a hearing, which

was held on  October 18, 2000 before Administrative Law Judge Edward McNeil  (Tr. 396-

425).  Plaintiff testified and was represented by counsel at the hearing.  Judge McNeil

found that plaintiff was not disabled within the meaning of the Social Security Act because

she retained the residual functional capacity to perform her past relevant work as a

housekeeper (*see* Tr. 43-48).

Subsequently, plaintiff filed a request for review of the hearing decision (Tr. 70).

The Appeals Council vacated ALJ McNeil's decision and remanded the case to the Office

of Hearings and Appeals for further proceedings (Tr. 72-78).  In doing so, the Appeals

Council took notice of a favorable determination issued in May 2001 granting plaintiff's

subsequent application for SSI benefits (protectively filed on February 26, 2001), and

advised plaintiff that her claims were being consolidated and remanded to an ALJ for the

purpose of rendering a revised decision.  The Appeals Council's remand order further

instructed the ALJ to reconsider plaintiff's residual functional capacity in light of any

---

[3]"Schizoaffective disorder" is defined as

a serious mental illness that has features of two different conditions, schizophrenia and an affective (mood) disorder, either major depression or bipolar disorder.

Schizophrenia is a brain disorder that distorts the way a person thinks, acts, expresses emotions, perceives reality and relates to others.  Depression is an illness that is marked by feelings of sadness, worthlessness or hopelessness, as well as problems concentrating and remembering details.  . . .

Schizoaffective disorder is a life-long illness that can impact all areas of daily living, including work or school, social contacts and relationships.  Most people with this illness have periodic episodes, called relapses, when their symptoms surface.  While there is no cure for schizoaffective disorder, symptoms often can be controlled with proper treatment.

WebMD Internet Medical Reference Service, http:\\www.webmd.com\content\article\60\67124.htm (reviewed by doctors at The Cleveland Clinic Department of Psychiatry and Psychology, July 2005).

updated treatment records and evidence from medical or vocational experts, and to offer plaintiff the opportunity for a new hearing (*id.*).

Accordingly, on September 24, 2002, a second hearing took place before a different ALJ, Bruce Mazzarella (Tr. 426-98).   Plaintiff was again represented by counsel, and testified at the hearing.   Vocational expert Julie Andrews testified as well.   In a decision dated February 4, 2004, ALJ Mazzarella found that plaintiff was not under a disability during the relevant period (Tr. 18-34).   Following the sequential evaluation process outlined in the Social Security Administration Regulations (*see* 20 C.F.R. §§ 404.1520, 416.920), the ALJ reviewed the medical evidence and determined that plaintiff's impairments (including schizoaffective disorder, post traumatic stress disorder, and asthma), while severe, did not meet or equal the criteria of an impairment listed in the Regulations at 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings").   The ALJ considered plaintiff's allegations and testimony regarding her functional limitations, but found plaintiff to be "not totally credible" in this regard (T. 33).   The ALJ then found that plaintiff was able to perform her past work as a housekeeper/cleaner, as she retained the residual functional capacity for the full range of light work[4]  (*id.*).   The ALJ's decision became the Commissioner's final

---

[4]Light Work is defined in the Regulations as follows:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R §§ 404.1567(b), 416.967(b).

determination on April 30, 2004, when the Appeals Council denied plaintiff's request for review (Tr. 10-13).

Plaintiff then filed this action on July 2, 2004, pursuant to the judicial review provision of 42 U.S.C. § 405(g).  On February 28, 2005, the Commissioner filed a motion for judgment on the pleadings on the ground that the ALJ's determination must be upheld because it is supported by substantial evidence in the record (Item 13).  Plaintiff  filed a cross-motion for judgment on the pleadings, arguing that the denial of her application should be reversed because the ALJ failed to properly evaluate all of the objective medical evidence and the opinions of plaintiff's treating sources, resulting in erroneous findings regarding her residual functional capacity (Item 14).

For the reasons that follow, the Commissioner's motion for judgment on the pleadings is denied, and plaintiff's cross-motion for judgment on the pleadings is granted.

## DISCUSSION

### I.     Scope of Judicial Review

The Social Security Act states that upon district court review of the Commissioner's decision, "[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ."  42 U.S.C. § 405(g).  Substantial evidence is defined as evidence which "a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938), *quoted in Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Tejada v. Apfel*, 167 F.3d 770, 773-72 (2d Cir. 1999).  Under these standards, the scope of judicial review of the Commissioner's decision is limited, and the reviewing court may not try a case *de novo* or substitute its findings for

those of the Commissioner. *Richardson*, 402 U.S. at 401.  The court's inquiry is "whether the record, read as a whole, yields such evidence as would allow a reasonable mind to accept the conclusions reached" by the Commissioner. *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982), *quoted in Winkelsas v. Apfel*, 2000 WL 575513, at *2 (W.D.N.Y. February 14, 2000).

However, "[b]efore the insulation of the substantial evidence test comes into play, it must first be determined that the facts of a particular case have been evaluated in light of correct legal standards." *Klofta v. Mathews*, 418 F. Supp. 1139, 1411 (E.D.Wis. 1976), *quoted in Gartmann v. Secretary of Health and Human Services*, 633 F. Supp. 671, 680 (E.D.N.Y. 1986).  The Commissioner's determination cannot be upheld when it is based on an erroneous view of the law that improperly disregards highly probative evidence. *Tejada*, 167 F.3d at 773.

## II.    Standard for Determining Eligibility for SSI Benefits

To be eligible for SSI under the Social Security Act, plaintiff must show that she suffers from a medically determinable physical or mental impairment "which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . .," 42 U.S.C. § 1382c(a)(3)(A), and is "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  42 U.S.C. § 1382C(a)(3)(B); *see also* 20 C.F.R. §§ 404.1505(a), 416.905(a).  The Regulations set forth a five-step process to be followed when a disability claim comes before an ALJ for evaluation of the claimant's eligibility for

benefits.  *See* 20 C.F.R. §§ 404.1520, 416.920.  First, the ALJ must determine whether the claimant is presently engaged in substantial gainful activity.  If the claimant is not, the ALJ must decide if the claimant has a "severe" impairment, which is an impairment or combination of impairments that "significantly limits [the claimant's] physical or mental ability to do basic work activities . . . ."  20 C.F.R. §§ 404.1520(c), 426.920(c).  If the claimant's impairment is severe, the ALJ then determines whether it meets or equals the criteria of an impairment found in the Listings.  If the impairment meets or equals a listed impairment, the claimant will be found to be disabled.  If the claimant does not have a listed impairment, the fourth step requires the ALJ to determine if, notwithstanding the impairment, the claimant is capable of performing his or her past relevant work.  Finally, if the claimant is not capable of performing the past relevant work, the fifth step requires that the ALJ determine whether the claimant is capable of performing other work which exists in the national economy, considering the claimant's age, education, past work experience, and residual functional capacity.  *See Curry v. Apfel*, 209 F.3d 117, 122 (2d Cir. 2000); *Reyes v. Massanari*, 2002 WL 856459, at *3 (S.D.N.Y. April 2, 2002).

The claimant bears the burden of proof with respect to the first four steps of the analysis.  If the claimant demonstrates an inability to perform past work, the burden shifts to the Commissioner to show that there exists other work that the claimant can perform. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999).  The Commissioner ordinarily meets her burden at the fifth step by resorting to the medical vocational guidelines set forth at 20

C.F.R. Pt. 404, Subpt. P, App. 2 (the "Grids").[5]  However, where the Grids fail to describe the full extent of a claimant's physical limitations, the ALJ must "introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform."  *Bapp v. Bowen*, 802 F.2d 601, 603 (2d Cir. 1986).

In this case, the ALJ determined that plaintiff had not engaged in substantial gainful activity since filing her reopened SSI application in February 1998 (Tr. 33).   Upon exhaustive review of plaintiff's medical records and in accordance with the second and third step of the sequential evaluation, the ALJ found that plaintiff suffered from schizoaffective disorder, post traumatic stress disorder, and mild asthma which, while "severe," did not individually or in combination meet or equal the requirements of the Listings (*id.*).

At the fourth step of the evaluation process, the ALJ determined that the plaintiff's past work as a housekeeper/cleaner was an unskilled job requiring a light level of exertion that did not require the performance of work-related activities precluded by her residual functional capacity.   The ALJ found that the plaintiff's medically determinable schizoaffective disorder, post traumatic stress disorder, and mild asthma did not prevent the plaintiff from performing her past relevant work (Tr. 33).

In her motion for judgment on the pleadings, plaintiff seeks reversal of this determination on the ground that the ALJ failed to properly evaluate the opinions and findings of plaintiff's treating sources, as well as the findings of consultative examiners, all

---

[5]The Grids were designed to codify guidelines for considering residual functional capacity in conjunction with age, education and work experience in determining whether the claimant can engage in any substantial gainful work existing in the national economy.  *See Rosa*, 168 F.3d at 78; *see also Zorilla v. Chater*, 915 F. Supp. 662, 667 (S.D.N.Y. 1996).

of which indicate that plaintiff was unable to engage in substantial gainful activity due to her psychiatric impairments.  What follows is the court's assessment of this contention in light of the rules which the Commissioner must follow in evaluating treating source evidence, as set forth in the Regulations and controlling case law.

## III.    Evaluation of Treating Physicians' Opinions

The Social Security Regulations require that the opinion of a claimant's treating physician which reflects judgments about the nature and severity of the claimant's impairments must be given "controlling weight" by the ALJ, as long as it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record . . . ."  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *see also Rosa*, 168 F.3d at 78-79.  If the opinion of the treating physician as to the nature and severity of the claimant's impairment is not given controlling weight, the Regulations require the ALJ to apply several factors to decide how much weight to give the opinion, including: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist."  *Clark v. Commissioner of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). The ALJ must "always give good reasons" in the notice of determination or decision for the weight given to the treating source's opinion, *id.* (citing 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)), and "cannot arbitrarily substitute his own judgment for competent medical opinion."  *Rosa*, 168 F.3d at 79 (internal quotation omitted); *see also Rooney v. Apfel*, 160 F. Supp. 2d 454, 465 (E.D.N.Y. August 14, 2001).

> As explained by the Social Security Administration, when the ALJ's determination: is not fully favorable, *e.g.*, is a denial . . .[,] the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *5 (S.S.A. July 2, 1996). Importantly, the Second Circuit holds to the rule that the opinion of a non-examining consultative physician, standing alone, cannot constitute substantial evidence to overcome the opinions of treating sources as to the nature and severity of the claimant's impairment. *See Pratts v. Chater*, 94 F.3d 34, 38 (2d Cir.1996); *see also Rodriguez v. Barnhart*, 249 F. Supp. 2d 210, 214 (E.D.N.Y. 2003); *Garzona v. Apfel*, 1998 WL 643645, at *1 (E.D.N.Y. September 18, 1998).

## A.    Treating Source Evidence of Record

In this case, the record indicates that plaintiff has a history of treatment at the Niagara County Adult Mental Health Clinic beginning in January 1996 (*see* Tr. 187).  She was hospitalized briefly in July 1996 at Niagara Falls Memorial Medical Center upon complaining of seeing visions, being depressed, and "thinking about taking an overdose" (Tr. 183).  The attending physician, Dr. Jin Soo Rhee, found plaintiff to be suffering from major depression, recurrent, with a fair to guarded prognosis and a Global Assessment of Functioning ("GAF")[6] score of 60 (*id.*).

---

[6]The Global Assessment of Functioning Scale ("GAF") is a rating of overall psychological functioning on a scale of 0 to 100.  A GAF score of 51 to 60 means that an individual has moderate symptoms or moderate difficulty in social, occupational, or school functioning.  A score of 41 to 50 indicates serious symptoms or serious impairment of social, occupational, or school functioning.  A score of 31 to 40 indicates some impairment in reality testing or communication, or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood.  American Psychiatric

Plaintiff was seen at the Mental Health Clinic in November 1997 by Dr. Demetrio P. Fajardo, M.D., a consulting psychiatrist, and by Mental Health Aide Jason Evans (Tr. 265). She reported depression, stress, anxiety with symptoms of irritability, auditory hallucinations, insomnia, flashbacks, poor concentration, and feelings of helplessness/hopelessness.  Dr. Fajardo's initial evaluation showed provisional recurrent major depression with PTSD, schizoaffective disorder of depressed type, and a GAF finding of 45-50 (*id.*).  Plaintiff was seen again at the clinic by Dr. Fajardo in December 1997.   Plaintiff reported depression, irritability, stress, and nervousness, along with flashbacks of sexual molestation by an uncle and rape by another man.  Dr. Fajardo's diagnostic impression was PTSD with coexisting psychoaffective disorder, mostly depressed type.  Plaintiff's GAF score had improved to 55-60 (Tr. 266-67).

Plaintiff was next seen at the clinic in January 1998 by consulting psychiatrist Dr. D. K. Singh.  Dr. Singh's progress notes indicate a diagnosis of chronic schizoaffective disorder, depressed type.  Plaintiff had been previously discharged by Dr. Fajardo with a prescription for Risperdal and Haldol, but Dr. Singh discontinued the Haldol and increased the dosage for Risperdal.  He also put her on a trial prescription of Zoloft to try to decrease her depression (Tr. 273).

She was seen again by Dr. Singh in April 1998.  She reported symptoms of depression, anxiety, anger, flashbacks, nightmares, sweating, shakes, loss of appetite, fatigue, poor concentration, sleep disturbance, paranoid delusions, and auditory and visual hallucinations.  She was taking Effexor, Desyrel, and Risperdal.  Dr. Singh's diagnostic

Association, Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) (4th ed. 2000).

-10-

impression was schizoaffective disorder and PTSD, with a GAF of 50 (Tr. 277).  Plaintiff returned to the clinic in November 1998, reporting that she had been in an abusive relationship and had been off of her medication in the six months since her last visit.  Her mood was depressed and anxious, her affect blunted and restricted.  Her thought content involved doubts, indecisiveness, suspicions and suicidal ideation.  Dr. Singh's diagnostic impression was schizoaffective disorder (primary) and PTSD (secondary), with a GAF of 45 (Tr. 278).

Dr. Singh saw plaintiff again in December 1998 and February 1999.  He reported that plaintiff was "very well stabilized" on her medications (Tr. 216).  He renewed her prescriptions for Effexor, Desyrel, and Risperdal (Tr. 215).

In a letter dated February 25, 1999, signed by Dr. Singh and Staff Social Worker Carol Bateman, CSW, it was reported that plaintiff was "not employable at [that] time" due to acute symptoms of schizoaffective disorder (depressed type, primary) and PTSD (secondary) (Tr. 167).  Subsequently, Dr. Singh was contacted by the New York State Department of Social Services Office of Disability Determinations and asked to clarify "the objective medical findings . . . that a 'total disability' exists" (Tr. 180).  Dr. Singh replied that his prior report did not indicate that plaintiff was "totally disabled," but rather, that she had a chronic, long term psychiatric condition with persistent symptomologies including "'voices,'" isolation, hypervigilence, nightmares, [and] fatigue" which affected her ability to perform household duties (*id.*).

In a report to the Niagara County Department of Social Services dated December 16, 1999, Dr. Singh indicated that plaintiff was "not able to work" due to extreme limitations in understanding and remembering instructions, maintaining attention and

concentration, and being able to function in a work setting on a consistent basis (Tr. 290-91).  At that same time, Dr. Singh signed a "Residual Functional Capacity Assessment (Mental)" form which indicated that plaintiff had marked limitations in virtually all areas of understanding and memory, sustained concentration and persistence, social interaction, and adaptation (Tr. 271-72).  He also signed a psychiatric report indicating plaintiff's marked difficulty in most areas of social functioning, performance of tasks related to daily living and work-related activities, and dealing with stressful circumstances (Tr. 268-70).

Plaintiff continued to see Dr. Singh at the Mental Health Clinic through February 2002, at which time Dr. Ramon Tan replaced Dr. Singh at the Clinic.  During this period, plaintiff's condition remained essentially unchanged until August 2000, when she was admitted to the mental health unit at Niagara Falls Memorial Medical Center "under voluntary status for crisis intervention" (Tr. 314).  Plaintiff told Dr. Jong Sung Lee, the attending physician, that she had not been taking her medication regularly. She "became very shaky" and "was scared she might do something like hurting herself" (*id.*).  She was brought to the hospital by her sister.  Dr. Lee's "working diagnosis" was major depression with psychotic features recurrent.  GAF score was 40.  On examination, plaintiff was "somewhat guarded."  Speech was coherent and relevant.  Affect was "somewhat depressed."  She admitted to some visual hallucinations, but was alert and oriented to time, place, and person (*id.*).  She was discharged on the same day "against medical consent," and was advised of the importance of taking her prescribed medications and keeping her appointments with the Mental Health Clinic (Tr. 315).

Plaintiff was seen again at the clinic by Dr. Singh in October 2000.  Dr. Singh reported that plaintiff was in partial remission.  She was taking her medications, which

-12-

helped control the "little voices" (Tr. 353).   Through April 2001, Dr. Singh's diagnoses remained essentially the same.  He indicated that he had increased the prescribed dosage of Risperdal and Desyrel to combat plaintiff's complaints of auditory hallucinations and mood swings, but gave her only one month's supply because she was not keeping her appointments with her therapist  (Tr. 354-55; 357).

Dr. Singh did not see plaintiff again until October 30, 2001, after she missed an appointment (and apparently had not returned to the clinic since April).   At this time, plaintiff's symptoms included depression, stress, and anger, precipitated by personal issues including a daughter leaving home, changing residences, her father's illnesses, and custody issues with her ex-husband.   She had obtained prescriptions for Risperdal, Trazodone, and Effexor from the hospital emergency room, but these medications were since depleted.  Upon mental status examination, Dr. Singh reported that plaintiff was fully oriented with clear and coherent speech and clear/organized thoughts.  Her mood/affect was depressed, and she was socially restricted and fearful of others.   Dr. Singh's diagnostic impression was schizoaffective disorder, depressed type, and PTSD.   GAF score was 50-55 (Tr. 356).

In November 2001, Dr. Singh signed another psychiatric report indicating plaintiff's continued marked difficulty in most areas of social functioning, performance of tasks related to daily living and work-related activities, and dealing with stressful circumstances (Tr. 337-39).   He also signed a "Functional Capacity Questionnaire for Psychiatric Disorders" indicating a marked limitation in performing daily activities and maintaining social functioning, and an extreme limitation in concentration, persistence, or pace in completing tasks in a timely manner.   Plaintiff continually experienced episodes of

deterioration or decompensation that caused her to withdraw or exacerbated her symptoms. She was completely unable to function independently outside her home. She exhibited severe limitation of the ability to perform almost all tasks in a work setting on a regular and continuous basis. Dr. Singh indicated that plaintiff's psychiatric impairments had lasted, or could be expected to last, for a minimum of 12 months (Tr. 340-45).

On May 8, 2002, Dr. Tan saw plaintiff at the clinic for "medication management." Dr. Tan noted that plaintiff was feeling well and that she denied any psychiatric symptoms. She reported good medication compliance with no side effects, good results, and good symptom control. Upon examination, plaintiff did not appear depressed or anxious. There was no evidence of delusions or hallucinations. No gross cognitive defects were noted. Diagnosis and prescriptions remained unchanged (Tr. 348).

Plaintiff was next seen by Dr. Tan on October 28, 2002, which completes the medical record pertaining to plaintiff's treatment at the Mental Health Clinic. During this final appointment, plaintiff reported adequate medication compliance and no side effects. She advised Dr. Tan that she was still hearing voices, but they were not in the form of commands and she did not follow them. Plaintiff reported poor appetite and weight loss, but also stated that she had been seen by her primary care physician and that he found her to be in good health. Dr. Tan reported that plaintiff was alert and did not appear depressed or anxious. Her affect was somewhat blunted, but examination was negative for self-destructive behavior, delusions, or gross cognitive deficits. Dr. Tan's diagnosis was "unchanged" (Tr. 360).

In a letter to ALJ Mazzarella dated December 19, 2002, signed jointly by Dr. Tan and plaintiff's therapist Jason Evans, it was indicated that plaintiff had been treated for

-14-

chronic and pervasive schizoaffective disorder and PTSD since at least October 2001.  Her progress was noted as "marginal at best."  She continued to report depressive episodes including sleep disturbances, irritability, hopelessness/helplessness, poor appetite, and isolation from others.  She had impaired concentration and memory, hypervigilence, intrusive and recurrent dreams and thoughts, and avoidance of activities, places, and people.   Her impairments affected her functional skills and quality of life, rendering her "unable to work at this time" (Tr. 390-91).

The record also reflects that Dr. Gerardo A. Juan, a psychiatrist, conducted a consultative mental status examination of plaintiff on June 15, 1999, at the request of the Commissioner.  Dr. Juan found blunted affect, very poor fund of information, inability to do simple calculations or spell, with suspicions, hallucinations, some compulsions and preoccupations about life.   Dr. Juan's diagnosis was possible schizophrenia paranoid with degree of improvement expected to be limited.  He did not believe she could handle her own funds.  He recommended continued outpatient psychiatric treatment (Tr. 191-93).

On October 5, 1999, plaintiff was seen by Dr. Robert J. Kamman, a psychologist, also at the Commissioner's request.   Dr. Kamman found clear evidence of major depression and possible schizoaffective disorder, with symptomatology indicating PTSD secondary to childhood sexual abuse.  Symptoms included anger, hostility, depression, limited judgment and insight, mild impairment for sustained focused attention, great limitation for abstract reasoning and concept formation, poor fund of knowledge, inability to do most memory tests, suspiciousness, and paranoia. Dr. Kamman found plaintiff's prognosis was "somewhat guarded," and that it is was "unlikely that at the present time she

could be competitively employed because of her depression, and perhaps some problems with her capacity for sustained focused attention" (Tr. 241).

### B.    ALJ'S Assessment of Treating Source Evidence

ALJ Mazzarella did not give controlling weight to this substantial evidence from both treating and examining consultative sources of plaintiff's inability to perform work-related activities due to her psychiatric impairments.  Instead, the ALJ "relied heavily" on a mental residual functional capacity assessment form and a psychiatric review technique form completed by Dr. April Ramirez, a non-examining State agency review psychiatrist, on October 4, 1999–prior to Dr. Singh's December 1999 assessment of plaintiff's residual mental functional capacity.  Dr. Ramirez reviewed the medical evidence then available and concluded that plaintiff's mental impairments would not prevent her from performing simple, repetitive work on a sustained basis in a low-contact job, but that she should not work closely with other people (Tr. 247).[7]

This finding by the ALJ runs afoul of the Second Circuit's rule that the opinions of a claimant's treating sources as to the nature and severity of the claimant's impairments, if consistent with other substantial evidence in the record, cannot be outweighed by the singular opinion of a non-examining consultative physician.  *See Pratts*, 94 F.3d at 38. This rule is of particular force where, as here, the opinions of the treating sources are supportive of each other and are consistent with the conclusions of the examining consulting physicians.  *See Rodriguez*, 249 F. Supp. 2d at 214.

---

[7]This assessment was independently evaluated on December 15, 1999 by Dr. Raphael Leo, a State agency review psychiatrist, and affirmed (Tr. 248).

By way of example, the residual functional mental capacity assessments signed by Dr. Singh (who treated plaintiff at the Mental Health Clinic on a regular basis for four years, between January 1998 and February 2002) clearly indicate that plaintiff continually experienced episodes of deterioration or decompensation that caused her to withdraw or exacerbated her symptoms, was completely unable to function independently outside her home, and exhibited severe limitation of the ability to perform almost all tasks in a work setting on a regular and continuous basis (*see, e.g.*, Tr. 340-45). As discussed above, this assessment was fully corroborated by the findings of Dr. Tan, as well as by the consultative findings of Drs. Juan and Kamman. In contrast, Dr. Ramirez found no more than moderate limitation of the ability to perform mental activities in a work-related setting (*see* Tr. 244-45), and found no evidence of episodes of deterioration or decompensation and no evidence of symptoms resulting in complete inability to function independently outside the home (Tr. 256).

In assessing the weight to be given these contradictory findings, the ALJ noted that Dr. Singh's assessment of plaintiff's residual mental functional capacity was inconsistent with his contemporaneous progress notes suggesting that plaintiff's symptoms generally remained "in good remission" during the times she was compliant with her prescribed medications (*see* Tr. 24-25). The ALJ also noted that Dr. Singh's assessment was made "based on [plaintiff]'s own estimation of her abilities and inabilities" (Tr. 25), and that "there appears to be an obvious correlation" between plaintiff's six-month cessation of psychiatric treatment after seeing Dr. Singh in April 2001 and the award of SSI benefits in May 2001 based on her February 2001 application (Tr. 26). The ALJ gave no indication that he considered the factors outlined in the Regulations–particularly, the length, nature, and

-17-

extent of the treatment relationship between plaintiff and Dr. Singh; the frequency of plaintiff's visits to the clinic; and the consistency of Dr. Singh's opinion as to the plaintiff's ability to work with the opinions of the other treating and examining consultants.  Rather, the reasons given for rejecting the treating sources' functional capacity assessments in favor of the assessment of the non-examining state agency reviewer reflect the ALJ's arbitrary substitution of his own judgment for competent medical opinion, which he cannot do.  *See Rosa*, 168 F.3d at 79.

Accordingly, after full review of the record, this court concludes that the ALJ's determination was based on an erroneous view of the legal standards for assessing the medical opinions of treating sources, with the result that the ALJ improperly disregarded highly probative evidence of plaintiff's eligibility for SSI benefits.  When given controlling weight, the opinions of plaintiff's treating sources, as corroborated by other substantial evidence in the record, make it clear that plaintiff's mental impairments precluded her from engaging in any kind of substantial gainful work which exists in the national economy, and could be expected to last for a continuous period of more than 12 months.

In light of this "persuasive proof of disability," *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980), and considering the long pendency of plaintiff's application (more than eight years), remand to the Commissioner for further proceedings would serve no purpose other than additional unnecessary delay.  Accordingly, remand solely for calculation and payment of benefits is appropriate.  *See Curry*, 209 F.3d at 124 (remanding for the sole purpose of calculating an award of benefits where record compelled finding of disability and plaintiff's application had been pending more than six years).

## **CONCLUSION**

Based on the foregoing analysis, the Commissioner's motion for judgment on the pleadings (Item 13) is denied, and plaintiff's cross-motion for judgment on the pleadings (Item 14) is granted.   Pursuant to sentence four of 42 U.S.C. § 405(g), the final determination of the Commissioner denying plaintiff's application for SSI benefits is reversed, and this matter is remanded to the Commissioner solely for the purpose of calculation and award of benefits.

The Clerk of the Court is directed to enter judgment in favor of plaintiff.

So ordered.

\s\ John T. Curtin
JOHN T. CURTIN
United States District Judge

Dated:    3/8                    , 2007
p:\opinions\04-493.feb2207